### KENTUCKY RIVER MILLS v. JACKSON.

No. 11740.

United States Court of Appeals
Sixth Circuit.

June 17, 1953.

Marion Rider, Frankfort, Ky. (Leslie W. Morris, Frankfort, Ky., on the brief), for appellant.

John L. Davis, Lexington, Ky. (James Park, Lexington, Ky., on the brief), for appellee.

Before SIMONS, Chief Judge, and McALLISTER and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

The issues in this case are: (1) whether an arbitration award was valid; (2) whether it could be enforced in the action commenced in the district court; and (3) whether an assignee for the purpose of suit could maintain an action on the assigned award.

The controversy arises out of the following circumstances: The Kentucky River Mills, appellant herein, is engaged in the operation of a spinning mill in Frankfort, Kentucky, spinning only such soft fibers as hemp and jute. In the latter part of 1943, after completing a large contract for the Navy, appellant sought to buy fiber for its own purposes. However, because of purchases by the government during the war period, such fibers as it had used in the past were not available on the open market. Appellant company, therefore, could not secure these fibers, at least until the domestic hemp crop would become available in the summer of 1944; and it was, accordingly, confronted with the alternatives of closing its mill or finding some other kind of fiber which it could spin.

For many years, appellant had purchased fiber for its own account through the firm of Smith & Bird, fiber brokers of New York City, and, in considering the needs of appellant company, Smith & Bird, in January 1944, suggested the use of a fiber called "caroa," grown and produced in Brazil. Appellant, accordingly, ordered a sample bale of caroa on January 19, 1944. After examining it, and taking into consideration the assurance of Smith & Bird that other mills in the East, engaged in the spinning of soft fibers, had used caroa in the past as a substitute for jute, appellant's general manager, in a telephone conversation on February 15, 1944, purchased 100 tons of caroa from Smith & Bird, at a price of $40,320. The purchase was confirmed by letter from Smith & Bird, and the fiber was promptly shipped, received, accepted, and paid for by appellant company. In the above mentioned letter confirming the sale, Smith & Bird informed appellant company that they had secured an option on an additional 200 tons of caroa, good for one week, and that they understood that the company would advise them shortly if they wanted this additional tonnage.

After the above mentioned shipment of fiber was received by appellant company, it was found that it would be necessary to make certain extensive changes in its mill in order to spin the fiber. Before making such changes, appellant's general manager went to New York during the week of February 21, 1944, to discuss with Smith & Bird the matter of the availability of sufficient fiber to meet its requirements in the future, and in the discussion, emphasized the company's concern to have sufficient fibers so that there would be no stoppages in its manufacturing program. Although the company did not order more caroa fiber until six weeks later, it was testified to by the company's general manager that at no time was there any indication that the fiber would be delayed in delivery or that the company would be prevented from operating its mill continuously. The discussion was generally about the possibility of getting fiber outside the United States, and appellant understood that, as to a possible shipment of 95 tons of the fiber which was mentioned as then being in Brazil, it would be necessary to secure an import permit from the federal government.

Following the New York conference, appellant's general manager, in a telephone conversation with Smith & Bird, on April 5, 1944, told them that appellant company would purchase 225 tons of the fiber that they had indicated would be available. He stated that he told them it was necessary that the company suffer no stoppages in its manufacturing program, and he testified, with regard to such conversation, that there were no indications of any difficulty in the matter other than that there would have to be secured a permit for importation of fibers from Brazil. Following this telephone conversation and on the same day, Smith & Bird wrote appellant company, confirming the telephone conversation, "at

which time it was agreed upon the following:

"We have sold you 100 tons [of fiber] * * *."

which, it was stated, would be shipped that week and the next.

"In addition to the foregoing we have sold you subject to confirmation 125 tons * * * of which there are 30 tons * * * on spot New York and the balance [of 95 tons] * * * will be prompt shipment from Brazil subject to obtaining import permit. Regarding these 125 tons, shortly after our telephone conversation with you we cabled Brazil this acceptance, and as soon as we have their reply we will advise you."

In the above mentioned letter, it will be seen that the confirmation of the order by Smith & Bird divided the fiber sold into two categories: (1) the 100 tons sold, and (2) the 125 tons sold "subject to confirmation," of which 30 tons were on spot in New York, and 95 tons in Brazil, subject to obtaining import permit.

Two days after the date of the above letter, Smith & Bird wrote appellant company, on April 7, 1944, as follows:

"Referring to our letter of April 5th, 1944, we have received confirmation of 125 tons of Caroa, and for the import portion have filed our application for licenses. Just as soon as we receive the permits, we will send you contract."

On April 20, Smith & Bird wrote appellant company:

"We are pleased to advise that today we received from Washington the War Production Board import permit covering 95 tons of Caroa Fibre.

"For the total of 125 tons sold you on April 7th you will find enclosed our two contracts in duplicate, as follows:

"No. 5529–A 30 tons No. 5 shipped from spot New York.

"No. 5529–B 95 tons comprised of 50 tons No. 3 and 45 tons No. 5 for shipment from Brazil as soon as possible.

"Kindly retain the accepted originals for your file and accept and return the duplicates to us at your convenience."

The two duplicate contracts enclosed in the above letter of April 20, 1944, provided for the sale of the 95 tons of caroa fiber from Brazil, and the provision therein as to shipment is as follows:

"SHIPMENT, as soon as possible, direct or indirect, with or without transhipment, for U. S. Atlantic port, thence by rail to Frankfort, Ky. (herein called destination). Shipment is contingent upon freight space being available to seller within the time specified; if such freight space is not available, shipment is to be as soon as possible thereafter."

It may be noted that while the contract was a printed form, the provision for shipment "as soon as possible" was in typewriting.

On April 22, 1944, appellant company received shipment of the 100 tons, mentioned as being sold in Smith & Bird's letter of April 5, 1944, as well as the 30 tons on spot in New York which were sold "subject to confirmation." At that time, the balance of the order of 95 tons, also sold subject to confirmation, was still in Brazil, although the order had been confirmed by Smith & Bird's vendor in that country.

When the above mentioned shipment of 130 tons of caroa arrived in Frankfort, appellant's general manager was out of the city. The fiber, however, was received, accepted, and paid for by appellant company, and no question is raised in any way about this shipment.

It is the shipment of the 95 tons of caroa fiber from Brazil that gives rise to this case; and one of the important issues is whether the parties agreed that shipment of the caroa fiber then in Brazil was to be made "promptly" or "as soon as possible."

When, in May 1944, appellant company's general manager returned to his office after a few weeks' absence, he found the letter of April 20, 1944, from Smith & Bird, and the two duplicate contracts therein enclosed, one for the 30 tons of fiber shipped from spot New York, which had already been received, and the other, for the 95 tons of fiber still at the port in Brazil awaiting shipping space. He read the letter and contracts, signed the contracts of purchase on behalf of appellant company, and returned

them to Smith & Bird, at the same time enclosing check in payment for the 30-ton shipment, with a letter stating: "You will find enclosed the duplicates of the contracts covering our purchase of Caroa Fibre with the proper endorsement indicated. Please accept our apology for the delay that has occurred in this instance." Below the signature was the notation: "Encls: Duplicates of two contracts covering the purchase of Caroa Fibre."

Because of the shortage of freight space in ships bound for this country from South America, due to war conditions, the Brazilian shipment continued to be delayed. On July 10, 1944, a member of the firm of Smith & Bird wrote appellant that shipping space from Brazil had been promised for the latter part of that month. Upon receipt of this letter, appellant's general manager called Smith & Bird by telephone, stating that they were putting the company in a very bad position, and that it was faced with the situation of stopping the mills, and revamping the machinery to go back into the spinning of hemp; and that, since the 95 tons had not yet cleared the port in Brazil, he informed Smith & Bird: "I think we would like to cancel our contract." He was, however, informed by Smith & Bird that because of the completion of their contract with their South American supplier, they were not in a position to cancel. The 95 tons in question arrived in New York from Brazil on September 12, 1944, and Smith & Bird wrote the company that it was being shipped immediately. In reply to this letter, the company's general manager telephoned them and said that the company felt it had no responsibility in the matter. In answer, Smith, one of the members of the firm, informed the general manager of appellant company that the fiber had been shipped in accordance with the contract which provided for shipment "as soon as possible." Appellant company then wired Smith & Bird that it would not be in a position to accept. Nevertheless, the fiber was shipped to the company by Smith & Bird, and upon its refusal to accept, the brokers were obliged to have it shipped elsewhere and sold at a loss; and it is for this loss that they received a judgment in

the district court for $14,712.56, with interest at 6 per cent from January 10, 1945, until paid.

We shall dispose, first, of one issue upon which the district court directed a verdict in favor of appellee. It was claimed by appellant company that the court should have submitted to the jury the question whether execution of the contract for the sale of the 95 tons of caroa fiber by Smith & Bird to appellant company was procured by fraud.

As a preliminary statement, it should be remarked that appellant seems, in some aspects of its argument, to rely upon the Smith & Bird letter of April 5, 1944, as constituting the contract that was actually consummated between the parties and to insist that the subsequent contract of April 20, 1944, which was thereafter executed by appellant, was not the agreement of the parties. Counsel claimed before the trial court that appellant "never made that contract." But it must be held that the contract of April 20, signed by both parties, was the contract between them. Appellant, in its answer to the complaint, admitted the execution of this contract, and sought to have the court adjudge it to be invalid by reason of its procurement through fraud. In no sense, then, can the Smith & Bird letter of April 5, 1944, confirming the telephone conversation between the parties, be considered as their contract.

In support of its contention that the contract of April 20 was procured by fraud, appellant submits that the fiber was purchased on the basis of "prompt shipment" rather than shipment "as soon as possible," and that the Smith & Bird letter of April 5, 1944, conclusively established such fact; that Smith & Bird learned from the owner of the fiber in Brazil, on April 17, 1944, that the best delivery he could hope to make was to ship a part of the fiber within a short time; that fair dealing required that they disclose to appellant the actual situation with respect to the ability of the owner to ship the fiber; that, instead, they were guilty of intentional and deliberate fraud in changing the terms of the contract to protect themselves from such known delay in shipment, and submitting a contract for

shipment "as soon as possible," instead of "prompt shipment;" that, in writing the letter setting forth that the fiber in Brazil would be shipped as soon as possible, and in submitting a contract specifically providing, by a stipulation written into the printed form, for shipment as soon as possible, the brokers obviously designed the letter to induce appellant to execute the contract which contained a material change in the terms of sale, without calling appellant's attention to the fact that the contract, as submitted, contained such a material change; and that the letter itself was part of the fraud. The argument is not persuasive. In the first place, the letter in question stated that the sale of the 95 tons of fiber, located in Brazil, was subject to confirmation from Brazil, and, also, subject to securing an import permit from the federal government. These contingencies in themselves were enough to show that, at that time, there could be no conclusive reliance by appellant company or the brokers upon prompt shipment of the fiber. Moreover, the letter informed appellant as plainly as it could that the terms of shipment were "as soon as possible;" and the contract, with its typewritten insertion, likewise called attention to the fact that the terms of shipment were "as soon as possible." In his answers to interrogatories filed in the case, appellant's general manager, an unusually well educated man, as well as an experienced business executive, stated that he had received the letter of April 20 and read it; that, through oversight and mistake, he failed to detect and understand that the letter submitted a contract for the sale of fiber and provided that shipment would be made as soon as possible, rather than a "prompt shipment;" that, according to his testimony, he presumed he read the portion of that contract "that had been filled in on the typewriter" and observed nothing therein that he thought was contrary to the understanding that he and the partners of Smith & Bird had as a result of the telephone conversation of April 5; and that he, accordingly, on behalf of appellant company, executed the contract providing for shipment as soon as possible, and mailed it to Smith & Bird as the contract "covering the purchase." The district court held that the general manager of appellant company was not deceived by the letter of Smith & Bird and that the evidence was entirely insufficient to establish or even to present to the jury any question as to their having practiced a fraud on appellant, or having intended to do so. In the light of the transcript of the record to which we have above referred, we are completely in accord with the view of the district court that there was no evidence to show any fraud practiced by the brokers in the procurement of the contract.

It is, however, contended by appellant that the provision in the contract for arbitration of any dispute arising thereunder did not authorize an ex parte arbitration under the laws of the State of New York rather than the applicable remedy provided by the Federal Arbitration Act, 9 U.S.C.A. § 1 et seq.; and that the enforcement of the award obtained by arbitration, in a suit based on diversity of citizenship, in the federal court in Kentucky, was contrary to law.

The provision for arbitration in the contract is as follows:

"23. Arbitration: Any dispute arising out of this contract of its interpretation shall be settled by arbitration in New York in the customary manner, buyer and seller each naming his arbitrator, whose award, or that of the umpire whom the arbitrators may appoint, shall be final and binding upon both parties. If either party fails to appoint an arbitrator within seven (7) days after receiving the other party's nomination of an arbitrator, the one arbitrator nominated may act as sole arbitrator * * * the seller and buyer consent that the arbitration shall be enforceable under and pursuant to the laws of the State, Country or Government having jurisdiction and that judgment upon the award may be entered in any court of any such jurisdiction."

Pursuant to the foregoing provision for arbitration, Smith & Bird, on November 24, 1944, notified appellant that they had appointed an arbitrator, Edward M. de

Castro, and requested appellant also to appoint an arbitrator, for arbitration of the following controversy: why an award should not be made in favor of Smith & Bird and against Kentucky River Mills in the amount of $14,174.59 and interest, for the failure of appellant to accept the caroa fiber in question pursuant to the terms of their contract. Appellant replied to Smith & Bird on December 4, 1944, that it did not recognize any obligation under the terms of the contract; that it did not recognize that the contract was valid or binding in any respect; and, further, that it declined to recognize the validity of any part or provision of the contract. Upon the submission to Mr. deCastro, by Smith & Bird, of proof that appellant had failed to appoint an arbitrator according to the terms of the contract, and its refusal to arbitrate the controversy, Mr. deCastro proceeded as sole arbitrator, and on January 10, 1945, made an award in favor of Smith & Bird against appellant in the amount of $14,505.-71. Thereafter, Smith & Bird assigned the award, for purposes of suit, to G. Harry Jackson, appellee herein, who filed petition for judgment on the award in the District Court for the Eastern District of Kentucky; and it is the appeal from the judgment entered by the district court on such award in favor of appellee which is here before us.

■ Appellant's contention as to the award is specifically stated as follows: that the contract was made in Kentucky and was to be performed in that state; and that the provision for arbitration was invalid under the laws of Kentucky. The answer to this contention is, as was held by the district court in a prior controversy involving this same award, that the contract between the parties evidenced a transaction involving interstate commerce, and, hence, the arbitration provision in the contract was rendered valid, and its enforceability was to be determined under the provisions of the United States Arbitration Act, 9 U.S.C.A. § 1 et seq. Jackson v. Kentucky River Mills, D.C.Ky., 65 F.Supp. 601.

What appears to be the principal claim of appellant with respect to the award is that it is invalid because it is the award of only one arbitrator. The above mentioned contract between the parties, however, provided that if either party failed to appoint an arbitrator within seven days after receiving the other party's nomination of an arbitrator, the one arbitrator nominated might act as sole arbitrator. The award of the single arbitrator was, therefore, entirely in accordance with the agreement of the parties, as evidenced by their written contract.

■■ Appellant, however, submits that the agreement to arbitrate is not self-executory; that where, under a contract providing for arbitration, one of the parties is aggrieved by the refusal of another to arbitrate, the recourse of the party aggrieved is to petition the court for an order directing that the arbitration proceed; and it is argued that an ex parte arbitration is contrary to the ordinary concepts of fairness. It is to be said that an arbitration by an arbitrator appointed by one of the parties only may well result in a degree of advantage to the other party, for mere personal friendship with one of the parties does not disqualify an arbitrator, and an arbitration carried on by such an arbitrator would not be contrary to ordinary concepts of fairness, although one would hardly be considered vigilant of his interests if he failed to appoint an arbitrator himself when he was entitled to do so. But it is the proof of bias or unfairness or partiality on the part of an arbitrator that results in unjust advantage, and calls for the setting aside of the award. See Davy v. Faw, 7 Cranch 171, 3 L.Ed. 305; American Guaranty Co. v. Caldwell, 9 Cir., 72 F. 2d 209. For arbitrators are selected to act in a quasi-judicial capacity, in the place of a court, and must be fair and impartial so as to render a faithful, honest, and disinterested opinion, in carrying out their obligation to do justice to the parties through their award. Davy v. Faw, supra; American Eagle Fire Ins. Co. v. New Jersey Insurance Co., 240 N.Y. 398, 148 N.E. 562.

Both parties agree that the state law does not govern either the matter of the validity or the enforcement of the award in this case. Appellant declares there is no question as to the fact that Congress, in the enactment

of the United States Arbitration Act, entered into the field of regulating the enforcement of the arbitration clauses contained in contracts evidencing transactions in interstate commerce, and, also, in such cases where one of the parties to such a contract refuses to arbitrate. However, appellant insists that Congress did not thereby sanction ex parte proceedings by one arbitrator, but provided the remedy where one party refuses to arbitrate in accordance with his contract by a procedure in which the federal court, on petition and hearing, can compel arbitration, and, in case of refusal of one of the parties to appoint an arbitrator, can appoint an arbitrator who would act under the agreement with the same effect as though he had been appointed by the contracting party. Title 9 U.S.C.A. §§ 2 and 4.

Section 2 of the Act provides that a written provision in a contract evidencing a transaction involving interstate commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Section 4 of the Act provides that a party aggrieved by the failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any court of the United States which, save for such agreement, would have jurisdiction under the judicial code of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

■ An ex parte arbitration was permissible at common law where provided for by the terms of the arbitration agreement; and, as is evident upon its face, Section 4 of the Act uses permissive language only, and does not, by its terms, require resort to the enforcement provisions thereof, if an ex parte arbitration is permitted by the terms of the arbitration agreement.

To sustain its contention that the ex parte award in this case was not valid, appellant relies upon the authority of Bullard

v. Morgan H. Grace Co., Inc., 240 N.Y. 388, 148 N.E. 559, 562, decided under Section 3 of the State Arbitration Law, of New York, which is comparable to Section 4 of the United States Arbitration Act. In that case, the Court of Appeals of New York had before it for consideration a proceeding in which the respondent therein and one of three arbitrators withdrew before the proofs of the parties had been presented. The two remaining arbitrators then proceeded to make an award. In its discussion, the court said that the agreement to arbitrate was not self-executory; that a party aggrieved by the refusal of another to perform under a contract for arbitration had the remedy, under Section 3 of the State Arbitration Law, of applying to the Supreme Court for an order directing that the arbitration proceed; that on such application, the other party might put in issue the making of the contract to arbitrate the questions sought to be submitted to arbitration; or the submission of such questions to arbitration; or the failure to comply therewith; and that, in such case, the court would order the parties to the contract to proceed with the arbitration in accordance with the terms thereof only, when it was found by the court that a written contract of arbitration had been made, or a submission entered into, covering the questions sought to be included in the arbitration, and, also, that one of the parties was in default in the performance thereof. In accordance with the foregoing, the court held that the award made by two of the three arbitrators was invalid.

In the Bullard case, the controversy arose between the arbitrators as to whether or not there was an agreement to arbitrate a particular question. The jurisdiction of the arbitrators depended upon the existence of an agreement to arbitrate the question to be decided by them, and at the arbitration hearing, challenge was made to their jurisdiction to consider the particular question that was then in dispute. It is not clear that the court, by its holding that the award was invalid, intended to declare that all awards rendered in ex parte statutory arbitrations were invalid except where the party desiring the arbitration procured an

enforcement order under Section 3 of the State Arbitration Law. In Sturges on Commercial Arbitration and Awards, pages 448/9, where extensive comment is made upon the Bullard case, the observation is made that it appears that it was the purpose of the court therein to announce that resort to enforcement proceedings under Section 3 was a prerequisite to an ex parte statutory arbitration when a question of jurisdiction of the arbitrators under the contract was placed in issue; and this view would seem to be borne out by the following statement of the court on that subject: "Arbitrators must observe their commission and keep within their jurisdiction. If a bona fide question arises as to the proper construction of the submission agreement, a party may raise the question by withdrawing from the arbitration. If the party aggrieved then desires to go on with the arbitration, he must apply to the court, and the court will determine whether or not the withdrawing party was in default in refusing to proceed to arbitrate a question covered by the submission agreement." It seems doubtful that the court in the Bullard case intended to include within the scope of its ruling cases where a party to an agreement to arbitrate refused to appear, when duly notified, or where he appeared and withdrew pending the hearing, giving no reason therefor or giving a reason that did not involve the authority of the arbitrators to act. For in such cases, there would be present no bona fide questions as to the construction of the submission agreement, nor the objection that the arbitration tribunal was determining for itself, over the protest of a party, to include within the scope of the arbitration questions that had not, in fact, been submitted to arbitration—all factors which were deemed to be of importance by the court in the Bullard case. See Sturges on Commercial Arbitration and Awards, supra.

In Finsilver, Still & Moss, Inc. v. Goldberg, Maas & Co., Inc., 253 N.Y. 382, 171 N.E. 579, 69 A.L.R. 809, the Court of Appeals of New York had occasion to discuss an amendment to the State Arbitration Law which had become effective subsequent to the decision in the Bullard case. In the course of the opinion, Chief Judge Cardozo, speaking for the court, pointed out that in an English case involving a New York contract providing for arbitration the House of Lords held that it was bound by the decision in the Bullard case, and that, accordingly, an award which had been made under a provision for arbitration was ineffective since one of the parties had refused to take part in it. At the same time, however, the House of Lords declared that, according to its own view of the law and the practice, an enforcement order was not indispensable, and an action on an award so made could be maintained. Liverpool Marine & General Ins. Co., Ltd. v. Bankers & Shippers Ins. Co. of New York, 24 Ll.L. Rep. 85, H.L. It is curious that in the Bullard case, which was decided on July 15, 1925, the Court of Appeals of New York adopted the reasoning of the trial judge in the above English case (sub. nom. Bankers' & Shippers' Ins. Co. of New York v. Liverpool Marine & General Ins. Co., Ltd.) which was decided March 4, 1925. Yet, subsequent to the decision in the Bullard case, both the English Court of Appeal, and, afterward, on January 29, 1926, the House of Lords, on the appeal of the Liverpool Insurance case, adopted a view of the law entirely contrary to that of the trial judge, which was quoted approvingly in the Bullard case, and, then, solely because of the decision in the Bullard case construing the law in New York, held that the award was, in the case before it, invalid.

Regardless of whether the Bullard case constituted a holding to the effect that every ex parte arbitration was invalid except where the party desiring arbitration procured an enforcement order under the statute, we are of the opinion that the award in the instant case was a valid award. The parties explicitly contracted for arbitration of any dispute arising out of the contract or its interpretation, and agreed that if one of them failed to appoint an arbitrator within seven days after receiving the other party's nomination of an arbitrator, the one arbitrator nominated might act as sole arbitrator. There was nothing in the terms of the contract that invalidated it. It was not contrary to public policy,

for such ex parte arbitrations were permitted under the common law. International Brotherhood of Teamsters v. Shapiro, 138 Conn. 57, 82 A.2d 345; Caldwell v. Caldwell, 121 Ala. 598, 601, 25 So. 825; Couch v. Harrison, 68 Ark. 580, 60 S.W. 957; Whitlock v. Redford, 82 Ky. 390, 393; Sanborn v. Paul, 60 Me. 325, 327; Gowen v. Pierson, 166 Pa. 258, 263, 31 A. 83. Appellant in the suit upon the award could have raised any defenses which it could have raised under the statutory proceeding for an order directing arbitration to proceed in accordance with the contract, under Section 4 of the Act. Such defenses would include the invalidity of the contract, duress, and fraud in its procurement. In fact, the defense of fraud in the procurement of the contract was raised by the appellant in this case and passed upon by the district court on the trial. Moreover, the terms of Section 4 of the Act are permissive, not mandatory. See International Brotherhood of Teamsters v. Shapiro, supra. Our conclusion is that it was not necessary for Smith & Bird to resort to Section 4 of the Act before proceeding to arbitration in this case by the single arbitrator.

 Regardless of the foregoing conclusions, appellant contends that the award in favor of Smith & Bird could not be enforced by an action at law commenced more than one year after the award was made. This claim is based upon the proposition that the enforcement of the award in this case is barred by Section 9 of the United States Arbitration Act, which provides that: "If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made." The language of the foregoing section as to application to the court for an order is not mandatory, but permissive. See United Fuel Gas Co. v. Columbian Fuel Corp., 4 Cir., 165 F.2d 746; Lehigh Structural Steel Co. v. Rust Engineering Co., 61 App.D.C. 224, 59 F.2d 1038. A party may, therefore, apply to the court for an order confirming the award, but is not limited to such remedy. Prior to the enactment of the United States Arbitration Act, an action at law on the award was the proper method of enforcing it. Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582. Enforcement of the award in this case is not barred by the one-year limitation contained in Section 9 of the Act, which provides for the summary remedy of confirmation of the award by the court.

 Appellant's claim that the assignment of the award for purposes of suit was invalid, cannot be sustained. Smith & Bird made the assignment, including therein power of attorney, in New York, to appellee, for purposes of suit which was brought in Kentucky. Appellee was the real party in interest; Titus v. Wallick, 306 U.S. 282, 59 S.Ct. 557, 83 L.Ed. 653; Rosenblum v. Dingfelder, 2 Cir., 111 F.2d 406; Heitzmann v. Willys-Overland Motors, Inc., D.C.N.Y., 68 F.Supp. 873; Price & Pierce, Ltd. v. Jarka Great Lakes Corp., D.C.Mich., 37 F.Supp. 939; and the validity of the assignment and title of the assignee is determined in this case by the law of the state of New York where the assignment was made, even though it might not be valid under the laws of Kentucky if made in Kentucky; Fogarty v. Neal, 201 Ky. 85, 255 S.W. 1049; although it is unnecessary to pass upon this latter question.

In conclusion, it may be observed that various futile proceedings on the award took place prior to the institution of the present action. It is claimed by appellant that in certain of those proceedings, the award was held unenforceable, lapsed, and dead. On the other hand, it is claimed by appellee that the award was held valid, and that such holding is res adjudicata. See Jackson v. Kentucky River Mills, D.C.Ky., 65 F.Supp. 601; Application of Jackson, D.C.N.Y., 77 F.Supp. 53, affirmed 2 Cir.,

170 F.2d 703. However, an examination of the above mentioned proceedings discloses that the question before us was not there in issue, and was, consequently, not heretofore decided.

In accordance with the foregoing, the judgment of the district court is affirmed.