ROBERT LAWRENCE COMPANY, Inc., Plaintiff-Appellee,

v.

DEVONSHIRE FABRICS, INC., Defendant-Appellant.

No. 121, Docket 25209.

United States Court of Appeals Second Circuit.

Argued Jan. 16, 1959.

Decided Oct. 28, 1959.

Martin H. Schneider, New York City (David I. Shivitz and Halperin, Natanson, Shivitz, Scholer & Steingut, New York City, on the brief), for defendant-appellant.

Oscar B. Sachs, New York City, for plaintiff-appellee.

Before MEDINA, LUMBARD and BURGER, Circuit Judges.

MEDINA, Circuit Judge.

Devonshire Fabrics, Inc. (Devonshire) appeals from an order denying its motion for a stay of proceedings pending arbitration pursuant to the United States Arbitration Act, 9 U.S.C. § 3.

Plaintiff in this action, Robert Lawrence Company, Inc. (Lawrence) is seeking damages for allegedly fraudulent misrepresentations made by Devonshire inducing it to purchase and pay for a quantity of woolen fabric. The transaction out of which this case arose was initiated on August 4, 1955 when Lawrence, a Massachusetts corporation, ordered through its New York City office 36 pieces of a certain style of wool. Devonshire, a New York corporation, upon receipt of the order issued a confirmation which differed in several respects from the terms of the order. While the parties disagree as to which document embodies the final contract, each of the two documents contains the following provision for arbitration:

"Any complaint, controversy, or question which may arise with respect to this contract that cannot be settled by the parties thereto, shall be referred to arbitration. If the controversy concerns the condition or quality of merchandise it shall be referred to the Mutual Adjustment Bureau of the cloth and garment trades pursuant to the rules and regulations thereof. All other controversies shall be submitted to the American Arbitration Association."

Delivery of the goods, originally scheduled for October 1, 1955 was postponed at Lawrence's request until June 1956 when shipment to Boston was made. Lawrence paid the purchase price of $9,-062.43 in July 1956. According to Lawrence, whose version of the fraud we must accept in the present posture of the case, certain latent defects were subsequently discovered and the merchandise proved not to be "first quality" as called for by the agreement. It is disputed whether Lawrence "rescinded" the contract or whether it waived its right to do so by later inconsistent acts.

The court below denied the stay of proceedings pending arbitration and held: "The question whether or not there is a valid agreement to arbitrate must be decided by the court prior to the issuance of a stay and cannot be submitted to arbitration 'as a controversy thereafter arising out of such contract' within section 2. * * * If the contract was fraudulent in its inception and therefore voidable at the option of the plaintiff and plaintiff has disaffirmed such contract, then there is no valid agreement to arbitrate which would justify a stay."

I

Questions of the Validity and Interpretation of an Arbitration Agreement "In Any Maritime Transaction or a Contract * * * Involving Commerce" Are Governed by Federal Not by Local Law

The case involves questions left open by the Supreme Court in Bernhardt v. Polygraphic Co. of America, Inc., 1956, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199, and these questions are interesting and important. The basic inquiry must be whether the validity and interpretation of the arbitration clause of the contract in this case is governed by Federal law, i. e. the federal Arbitration Act, or by local law. But this critical issue is imbedded in a proliferation of collateral questions, and all must be considered against the background of the concurring opinion of Mr. Justice Frankfurter in Bernhardt to the effect that, in order to avoid vexing constitutional questions under Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the Arbitration Act must be held wholly inapplicable in a diversity case. We are reluctant to disagree with so eminent a jurist whose views are so widely respected but feel compelled to reach a different conclusion, not only because the exclusion of diversity cases would emasculate the federal Arbitration Act, but because we find a reasonably clear legislative intent to create a new body of substantive law relative to arbitration agreements affecting commerce or maritime transactions. Thus we think we are here dealing not with state-created rights but with rights arising out of the exercise by the Congress of its constitutional power to reg-

ulate commerce and hence there is involved no difficult question of constitutional law under Erie.

The arbitration agreement before the Court in Bernhardt did not involve commerce nor did it affect a maritime transaction. But the defendant in that case moved for a stay pending arbitration on the theory that the federal Arbitration Act was applicable because the limitations of Section 2 were said not to affect Section 3, and, even if the Act was not applicable, that arbitration was a mere mode of procedure and a federal court should follow its own practice rather than that of Vermont because in matters of procedure the law of the forum controls. This reasoning would have by-passed certain old Vermont cases holding arbitration agreements to be revocable prior to the making of an award and unenforceable. But such a result ran into Erie R. Co. v. Tompkins head-on for the obvious reason that, had the case not been removed from the Vermont state court by reason of the diversity of citizenship of the parties, the determination of the merits of the controversy between the parties in the federal court might well have been just the opposite to the one that would have been reached had the case been permitted to remain in the state court. So the Court decided the case by holding: (1) that the federal Arbitration Act was inapplicable because the limitation to commerce and maritime matters in Section 2[1] applied as well to Section 3[2] and the rest of the Act; and, (2) that the enforceability of an arbitration agreement, apart from the Arbitration Act, "substantially affects the cause of action created by the State" [350 U.S. 198, 76 S.Ct. 276] and, because the dispute between the litigants was sufficiently substantive to bring into operation the Erie doctrine, the Court refused to apply the rule that the law of the forum governs matters of procedure. The Court flatly disagreed with the statement that arbitration "is merely a form of trial." Instead, the Court held that it was dealing with "a right to recover that owes its existence to one of the States, not to the United States"; and the view of the federal District Judge in Vermont as to the Vermont law relative to the enforceability of arbitration agreements was adopted. This conclusion was reached notwithstanding the fact that in several other contexts the enforceability of an arbitration agreement had generally been considered to be procedural only.[3] But the constitutional difficulties Justice Frankfurter feared only

1. Section 2 of the Act provides:
 "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

2. Section 3 of the Act provides:
 "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

3. For choice of law purposes it has been generally held that the forum is free to apply its own "remedy" and is not compelled to enforce an arbitration agreement by applying the law of the State with the controlling contracts. See Meacham v. Jamestown, Franklin & Clearfield Ry., 1914, 211 N.Y. 346, 105 N.E. 653; Gantt v. Felipe Y. Carlos Hurtado & Cia, Ltda, 1948, 297 N.Y. 433, 79 N.E.2d 815; Vitaphone Corp. v. Electrical Research Products, 1933, 19 Del.Ch. 247, 166 A. 255. For the purpose of determining whether a state act enforcing arbitration is constitutional or an intrusion upon federal admiralty jurisdiction, the Supreme Court held arbitration to be "remedial." Red Cross Line v. Atlantic Fruit Co., 1924, 264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582.

become operative if the Arbitration Act is regarded as exclusively procedural in character and scope. And, if the Congress had relied solely on its power to regulate procedure in the federal courts to make arbitration agreements valid and enforceable, it might well be doubted whether the constitutional base provided adequate support for the legislative structure. But see Sturges and Murphy, Some Confusing Matters Relating to Arbitration Under the United States Arbitration Act, 17 Law & Contemp.Probs. 580, 587 (1952).

We think it is reasonably clear that the Congress intended by the Arbitration Act to create a new body of federal substantive law affecting the validity and interpretation of arbitration agreements. In the first place Section 2 of the Arbitration Act specifically limits its applicability to "any maritime transaction or a contract evidencing a transaction involving commerce." This indicates a congressional intention to rely on the admiralty power implied from Article III, Section 2, Clause 3 and the commerce power, Article I, Section 8, Clause 3. Such intention is confirmed by the legislative history. See H.R.Rep. 96, 68th Cong., 1st Sess., p. 1 (1924). Moreover, the Bernhardt ruling is specifically to the effect that the maritime or commerce requirements had to be met before any other section of the Act could be applied. It is true that an additional reason for construing the Act "narrowly"

was that such a construction avoided a constitutional difficulty arising out of the Erie doctrine; but we think this does not lessen the force of the principal basis for the ruling which is that the Congress intended the maritime or commerce requirements to permeate the Act in its entirety.

It is also clear that the Congress intended to exercise as much of its constitutional power as it could in order to make the new Arbitration Act as widely effective as possible. One of the dark chapters in legal history concerns the validity, interpretation and enforceability of arbitration agreements. From the standpoint of business men generally and of those immediately affected by such agreements they were beneficial and salutary in every way. But to the courts and to the judges they were anathema. In England and in America the courts resorted to a great variety of devices and formulas to destroy this encroachment on their monopoly of the administration of justice, protecting what they called their "jurisdiction." An attempt to enumerate the ways in which arbitration agreements were declared to be against public policy and void, or revocable or unenforceable would now serve no useful purpose. See Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., 2 Cir., 1942, 126 F.2d 978, 982. Suffice it to say for a considerable time prior to the passage of the Arbitration

A similar characterization was also made to determine if the New York Act could constitutionally apply retroactively. Berkovitz v. Arbib & Houlberg, 1921, 230 N.Y. 261, 130 N.E. 288. In pre-Erie diversity cases the enforcement of an arbitration agreement was deemed "procedural" and state statutes upholding the agreements were accordingly held inapplicable. California Prune & Apricot Growers' Ass'n v. Catz American Co., 9 Cir., 1932, 60 F.2d 788, 85 A.L.R. 1117; Lappe v. Wilcox, D.C.N.D.N.Y.1926, 14 F.2d 861. And the federal judicial power in admiralty was deemed not to have been unduly extended by the new enforcement provisions of the Act but was a valid exercise of congressional power "to pro-

vide remedies in matters falling within the admiralty jurisdiction of the federal courts, and to regulate their procedure." Marine Transit Corp. v. Dreyfus, 1932, 284 U.S. 263, 52 S.Ct. 166, 170, 76 L.Ed. 282. Indeed, even in the Erie context prior to Bernhardt the dominant view was that the enforceability of arbitration agreements was procedural. Compare Murray Oil Products Co. v. Mitsui & Co., 2 Cir., 1944, 146 F.2d 381; Parry v. Bache, 5 Cir., 1942, 125 F.2d 493; Pioneer Trust & Savings Bank v. Screw Mach. Products Co., D.C.E.D.Wis.1947, 73 F.Supp. 578 with Tejas Development Co. v. McGough Bros., 5 Cir., 1947, 165 F.2d 276.

Act in 1925 [4] the Congress had come to the conclusion that an effort should be made to legislate on the subject of arbitration in such fashion as to remove the hostility of the judiciary and make the benefits of arbitration generally available to the business world. See Sen.Rep. 536 supra. At that time and even today, in various states judge-made law still stands as an obstacle to the enforceability of arbitration agreements, as was illustrated in Bernhardt. It was not assumed that this hostility could be easily overcome, despite certain encouragement in the ranks of those in opposition. See Red Cross Line v. Atlantic Fruit Co., 1924, 264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582; Atlantic Fruit Co. v. Red Cross Line, D.C.S.D.N.Y.1921, 276 F. 319, affirmed 2 Cir., 1924, 5 F.2d 218; United States Asphalt Refining Co. v. Trinidad Lake Petroleum Co., D.C.S.D. N.Y.1915, 222 F. 1006. Hence the Congress took pains to utilize as much of its power as it could and by doing so it sought to reduce to a minimum the danger of judicial rejection on constitutional grounds.

Thus we think the text of the Act and the legislative history demonstrate that the Congress based the Arbitration Act in part on its undisputed substantive powers over commerce and maritime matters. To be sure much of the Act is purely procedural in character and is intended to be applicable only in the federal courts. But Section 2 declaring that arbitration agreements affecting commerce or maritime affairs are "valid, irrevocable, and enforceable" goes beyond this point and must mean that arbitration agreements of this character, previously held by state law to be invalid, revocable or unenforceable are now made "valid, irrevocable, and enforceable." This is a declaration of national law equally applicable in state or federal courts. See Kochery, The Enforcement of Arbitration Agreements in the Federal Courts: Erie v. Tompkins, 39 Corn.

L.Q. 74, 78 (1953). This conclusion flows directly from the realization by the Congress that nothing of significance would have been accomplished without tapping these substantive sources of power. It is these that put teeth into the statute and make it accomplish the salutary and beneficial ends the Congress had in mind. It matters not that in the interval of years since the passage of the Act this point has only rarely been noticed. See Standard Magnesium Corp. v. Fuchs, 10 Cir., 1957, 251 F.2d 455; Kentucky River Mills v. Jackson, 6 Cir., 1953, 206 F.2d 111, 117–118, 47 A.L.R.2d 1331, certiorari denied 346 U.S. 887, 74 S.Ct. 144, 98 L.Ed. 392. What does matter is whether or not this reasoning is sound. And we believe it to be sound if the Congress intended to use to the fullest possible extent its powers to regulate commerce as it was affected by arbitration agreements and to do the same thing in the field of maritime law.

Nor do we think there is any tenable distinction between the holding in Bernhardt that the enforceability of an arbitration agreement is sufficiently substantive to call into play the Erie doctrine and our holding in this case that the questions of the validity and interpretation of the arbitration agreement before us are substantive questions. In any event, it seems safe to say that those who drafted the Arbitration Act and supervised its progress through the House and Senate Committees had not the least suspicion that there might at some future day be raised the constitutional question referred to in Mr. Justice Frankfurter's concurring opinion in Bernhardt, the avoidance of which led him to the view that the Arbitration Act was wholly inapplicable to cases where the jurisdiction of the federal court was based on diversity of citizenship. Erie still was hidden in the mist of the future.

Mere catchwords, labels and clichés no longer smooth the path of justice as they

---

**4.** The federal Arbitration Act, Title 9 of the United States Code, was first enacted in 1925, 43 Stat. 883. It was repealed and substantially reenacted in codified form in 1947, 61 Stat. 669.

so often did in the past. As noted above, arbitration has often been described as pertaining to the law of remedies, but this tendency is losing much of its fascination in these modern times. See Ross v. Twentieth Century-Fox Film Corp., 9 Cir., 1956, 236 F.2d 632; Jackson v. Atlantic City Electric Co., D.C.D.N.J.1956, 144 F.Supp. 551; Miller v. American Insurance Co., D.C.W.D.Ark.1954, 124 F. Supp. 160; Kochery, The Enforcement of Arbitration Agreements in the Federal Courts: Erie v. Tompkins, supra; Note, 56 Colum.L.Rev. 902 (1956); 41 Va.L.Rev. 379 (1955); Comment 27 Tex. L.Rev. 218 (1948). The opinion of Mr. Justice Douglas in Bernhardt summarizes nicely the manifold effects of such agreements.[5] We need not belabor them here. The crucial point is that the "nature of the tribunal where suits are tried is an important part of the parcel of rights behind a cause of action." See 350 U.S. at page 203, 76 S.Ct. at page 276. Whether the bargain evidenced by the contract or agreement is or is not valid cannot differ essentially from the question of whether any other meeting of the minds of the parties will be recognized as having created certain rights. And the same may be said of the rules or principles to be evolved in connection with the construction and interpretation of the agreement.

It is interesting to note that though new substantive federal rights were created, suits involving the application of the Arbitration Act do not furnish an independent basis of federal jurisdiction under 28 U.S.C. § 1331. Krauss Bros. Lumber Co. v. Louis Bossert & Sons, Inc., 2 Cir., 1933, 62 F.2d 1004; In re Woerner, 2 Cir., 1929, 31 F.2d 283; Mengel Co. v. Nashville Paper Products and Special-

ty Workers Union, 6 Cir., 1955, 221 F.2d 644. But see Local 19, Warehouse, Processing and Distributive Workers Union, etc. v. Buckeye Cotton Oil Co., 6 Cir., 1956, 236 F.2d 776, 781, certiorari denied 1957, 354 U.S. 910, 77 S.Ct. 1293, 1 L.Ed. 2d 1428. This is evident upon consideration of the Act as a whole as the Congress under its Article III powers sought to prevent the federal courts from becoming unduly snarled by this far-reaching law. Section 4 relating to the filing of a petition to compel arbitration provides for such filing only in "any court of the United States which, save for such agreement, would have jurisdiction under the judicial code at law, in equity, or in admiralty of the subject matter of a suit arising out of the controversy between the parties." And proceedings on motion for a stay pursuant to Section 3 are authorized only in "the court in which * * * suit is pending," which must mean a suit in which the court already has jurisdiction over subject matter. Section 8 [6] also seems to presuppose a basis of jurisdiction other than the Arbitration Act. The explicitness with which the Congress indicated that the assertion or denial of a right arising under the Act is not sufficient to give the federal court jurisdiction over subject matter constitutes further proof that something more than mere "procedural" rules were intended. For if the Act were entirely "procedural" in character, it plainly could not furnish a basis of federal jurisdiction.

While the jurisdiction under either Section 3 or Section 4 may doubtless in some instances be federal question jurisdiction, based upon rights alleged to arise out of some federal statute other than the Arbitration Act, it would seem

---

5. 350 U.S. at pages 203–204, 76 S.Ct. at page 276.

6. Section 8 of the Act provides:
 "If the basis of jurisdiction be a cause of action otherwise justiciable in admiralty, then, notwithstanding anything herein to the contrary, the party claiming to be aggrieved may begin his proceeding hereunder by libel and seizure of the vessel or other property of the other party according to the usual course of admiralty proceedings, and the court shall then have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award."

that the most numerous class of cases in which it was anticipated that resort would be made to the federal courts for the enforcement of arbitration agreements was diversity cases.

We, therefore, hold that the Arbitration Act in making agreements to arbitrate "valid, irrevocable, and enforceable" created national substantive law clearly constitutional under the maritime and commerce powers of the Congress and that the rights thus created are to be adjudicated by the federal courts whenever such courts have subject matter jurisdiction, including diversity cases, just as the federal courts adjudicate controversies affecting other substantive rights when subject matter jurisdiction over the litigation exists.[7] We hold that the body of law thus created is substantive not procedural in character and that it encompasses questions of interpretation and construction as well as questions of validity, revocability and enforceability of arbitration agreements affecting interstate commerce or maritime affairs, since these two types of legal questions are inextricably intertwined.

In the case before us there can be little doubt that the transaction in question relates to an interstate shipment of goods and involves "commerce" within the meaning of Sections 1 and 2.[8] Kentucky River Mills v. Jackson, 6 Cir., 1953, 206 F.2d 111, 47 A.L.R.2d 1331, certiorari denied 346 U.S. 887, 74 S.Ct. 144, 98 L.Ed. 392; Petition of Prouvost Lefebvre, D.C. S.D.N.Y.1952, 105 F.Supp. 757; Wilson & Co. v. Fremont Cake & Meal Co., D.C. D.Neb.1948, 77 F.Supp. 364, affirmed 8 Cir., 1950, 183 F.2d 57. We, therefore, find federal law as derived from the Arbitration Act to be controlling.

## II

### Formulation and Application of Substantive Rules Governing Arbitration Agreements Involving Commerce

We now turn to the decision of this case and the formulation of the principles of federal substantive law necessary for this purpose.

The District Court held that there could be no finding of an "agreement to arbitrate" until it was judicially resolved whether or not there was fraud in the inception of the contract as alleged by Lawrence. But surely this is oversimplification of the problem. For example, it would seem to be necessary to answer the following questions before we can decide to affirm or reverse the order appealed from: (1) is there anything in the Arbitration Act or elsewhere to prevent the parties from making a binding agreement to arbitrate any disputes thereafter arising between them, including a dispute that there had been fraud in the inception of the contract; (2) is the exception of Section 2, "save upon such grounds as exist at law or in equity for the revocation of any contract" applicable if such an agreement to arbitrate has been made and the only fraud charged is fraud in inducing the purchase of the goods, rather than fraud in connection with the making of the agreement to arbitrate; (3) did the parties in the case before us make a binding agreement to arbitrate; and (4) is the arbitration clause broad enough to cover the charge of fraud.

That the Arbitration Act envisages a distinction beteen the entire contract between the parties on the one hand and the arbitration clause of the contract on the other is plain on the face of the statute. Section 2 does not purport to affect

---

7. We think the court in Ross v. Twentieth Century-Fox Film Corporation, 9 Cir., 1956, 236 F.2d 632, misconstrued Bernhardt when it held that the contract in that case, which involved commerce, was required by the Bernhardt reasoning to be interpreted according to California law.

8. Section 1 of the Act provides in part: " 'commerce', as herein defined, means commerce among the several States or with foreign nations, * * *"

the contract as a whole. On the contrary, it makes "valid, irrevocable, and enforceable" only a "written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction"; and Section 3 provides for the granting of a stay in any suit or proceeding in the federal courts "upon an issue referable to arbitration under an agreement in writing for such arbitration."

Our construction of Section 2 treating the agreement to arbitrate as a separable part of the contract is based not only upon the clear wording of the text but is buttressed by several other pertinent considerations. Historically arbitration clauses were treated as separable parts of the contract, although such treatment generally meant the agreement was being deprived of its efficacy. Hamilton v. Home Insurance Co., 1890, 137 U.S. 370, 11 S.Ct. 133, 34 L.Ed. 708; Gatliff Coal Co. v. Cox, 6 Cir., 1944, 142 F.2d 876; United States Asphalt Refining Co. v. Trinidad Lake Petroleum Co., D.C.S.D. N.Y.1915, 222 F. 1006. And since the passage of the Arbitration Act, the courts have similarly held that the illegality of part of the contract does not operate to nullify an agreement to arbitrate. Wilko v. Swan, 2 Cir., 1953, 201 F.2d 439, reversed on other grounds 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168; Watkins v. Hudson Coal Co., 3 Cir., 1945, 151 F.2d 311, certiorari denied 327 U.S. 777, 66 S.Ct. 522, 90 L.Ed. 1005; Petition of Prouvost Lefebvre, D.C.S.D.N.Y. 1952, 105 F.Supp. 757. Nor does the alleged breach or repudiation of the contract preclude the right to arbitrate. Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., 2 Cir., 1942, 126 F.2d 978; Almacenes Fernandez, S.A. v. Golodetz, infra, 2 Cir., 148 F.2d 625; In re Pahlberg Petition, 2 Cir., 1942, 131 F.2d 968.

Finally, any doubts as to the construction of the Act ought to be resolved in line with its liberal policy of promoting arbitration both to accord with the original intention of the parties and to help ease the current congestion of court calendars. Such policy has been consistently reiterated by the federal courts and we think it deserves to be heartily endorsed. See Shanferoke Coal & Supply Corp. v. Westchester Service Corp., 293 U.S. 449, 453, 55 S.Ct. 313, 79 L.Ed. 583; Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., supra, 2 Cir., 126 F.2d 978; Signal-Stat Corp. v. Local 475, 2 Cir., 1956, 235 F.2d 298, certiorari denied 1957, 354 U.S. 911, 77 S.Ct. 1293, 1 L.Ed.2d 1428. See also Wabash R. Co. v. American Refrigerator Transit Co., 8 Cir., 1925, 7 F.2d 335, 351, certiorari denied 1926, 270 U.S. 643, 46 S.Ct. 208, 70 L.Ed. 776.

It would seem to be beyond dispute that the parties are entitled to agree, should they desire to do so, that one of the questions for the arbitrators to decide in case the controversy thereafter arises, is whether or not one of the parties was induced by fraud to make the principal contract for the delivery of the merchandise. Surely there is no public policy that would stand as a bar to an agreement of such obvious utility, as is demonstrated by the facts of this case. The issue of fraud seems inextricably enmeshed in the other factual issues of the case. Indeed, the difference between fraud in the inducement and mere failure of performance by delivery of defective merchandise depends upon little more than legal verbiage and the formulation of legal conclusions. Once it is settled that arbitration agreements are "valid, irrevocable, and enforceable" we know of no principle of law that stands as an obstacle to a determination by the parties to the effect that arbitration should not be denied or postponed upon the mere cry of fraud in the inducement, as this would permit the frustration of the very purposes sought to be achieved by the agreement to arbitrate, i. e. a speedy and relatively inexpensive trial before commercial specialists.

The saving clause of Section 2 fits perfectly into the framework disclosed by the above analysis. The agreement

described in Section 2 is the arbitration "provision" or clause of the principal contract. If this arbitration clause was induced by fraud, there can be no arbitration; and if the party charging this fraud shows there is substance to his charge, there must be a judicial trial of that question before a stay can issue in a case of the type with which we are now dealing. It is not enough that there is substance to the charge that the contract to deliver merchandise of a certain quality was induced by fraud.

 Did the parties in the case before us make a binding agreement to arbitrate? While this narrow issue was obscured in the court below by the miscellaneous and varied contentions of the parties, we think it clear that there exist no grounds "at law or in equity" for the revocation of the arbitration clause of the contract between Lawrence and Devonshire. Indeed, there is no dispute on the point. Lawrence does not allege that the arbitration provision was induced by fraud. Nor could it do so with any show of reason as its own order contained this identical clause. What Lawrence does claim is that the entire transaction was induced by fraud and that the arbitration provision necessarily falls with the rest. This contention we reject as above stated, because the facts of this case do not support the argument.

Accordingly, there is no reason why we should not now decide this preliminary issue and we hereby find that the parties did agree upon the arbitration clause quoted in the early part of this opinion and that such agreement is valid and binding.

 It may well be that such charges of fraud may in some cases postpone arbitration because there is so little to support the finding that the parties agreed to arbitrate as to make necessary a preliminary trial of the issue of alleged fraud, to be followed by another trial before the arbitrators, if there is found by the court to have been no fraud. As has been shown, this case is different. And we would suppose that generally where the arbitration provision of the contract is sufficiently broad to encompass the issue of fraud, the mutual promises to arbitrate would form the *quid pro quo* of one another and constitute a separable and enforceable part of the agreement. We do not decide this point, however, as it is not necessarily before us.

Certainly this is not a case like Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., supra, 2 Cir., 126 F.2d 978, where the defendant denied ever agreeing to anything. Naturally such a question had first to be settled before arbitration could be directed. But it is remarkably similar to Almacenes Fernandez, S.A. v. Golodetz, 2 Cir., 1945, 148 F.2d 625, where "fraud in the performance" was held to be an arbitrable question. See also Reynolds Jamaica Mines, Ltd. v. La Societe Navale Caennaise, 4 Cir., 1956, 239 F.2d 689; McElwee-Courbis Construction Co. v. Rife, D.C.M.D.Pa. 1955, 133 F.Supp. 790. The issue of fraud in the procurement of the contract was evidently litigated by consent in Kentucky River Mills v. Jackson, supra, 6 Cir., 206 F.2d 111, 120, certiorari denied 346 U.S. 887, 74 S.Ct. 144, 98 L.Ed. 392, but the broad dictum at page 120 of 206 F.2d would seem to indicate that the charge of fraud must in every case be judicially tried and disposed of. If this be a fair interpretation of the language of the opinion we think it too broad and we disagree with it.

 In the view we take of the case before us it is immaterial that Lawrence claims to have rescinded the contract and that Devonshire disputed this claim and asserts that Lawrence by later inconsistent acts waived any right to rescind. We say there was a valid agreement to arbitrate, that all that remains is to construe the agreement and that the controversy over fraud in the inducement, whether Lawrence affirmed or disaffirmed the contract and attempted to or did rescind it, is a "complaint, controversy or question" which arose "with respect to this contract."

What is the proper construction and interpretation of the arbitration clause? Did the parties intend the arbitration

proceedings to encompass a charge of fraud in the inducement to make the principal contract for delivery of the merchandise? We think it is clear that the parties did just that. It would be hard to imagine an arbitration clause having greater scope than the one before us. Certainly fraud in the inducement is a "complaint, controversy or question which may arise with respect to this contract that cannot be settled by the parties thereto." And we fail to perceive any rational basis for thinking that the issue is of such a character that only the courts can resolve it. We think that the charge of fraud in the inducement comes squarely within the phraseology of this particular agreement and that nothing short of a renascence of the old judicial hostility to arbitration could evolve a contrary ruling.

We note that were we compelled to apply New York law to the problems involved in this case, we would have been forced to arrive at a contrary conclusion. Had this not been so, we would not have given such detailed consideration to the choice of the applicable law. But the pattern and substance of New York law appear to be different than what we have found the federal law to be.

This seems to have been made clear in the 1957 decision of the New York Court of Appeals in Matter of Wrap-Vertiser Corp. (Plotnick), 3 N.Y.2d 17, 163 N.Y.S. 2d 639, 640, 143 N.E.2d 366. Plotnick claimed that he had been induced to pay $6,000 when the agreement was executed "for the purchase of supplies for distribution, on the strength of misrepresentation respecting the past business of the manufacturer, respecting a patent which the manufacturer claimed to have had but did not have, and with regard to the nature of the product." The arbitration clause which provided for the arbitration of any question "as to the validity, interpretation or performance of this agreement," was held not to encompass the question of fraud in the inducement. There was a strong dissent by Judge Burke, in which Judge Fuld and Judge Froessel concurred. There was no dis-cussion of the separability of the arbitration agreement. Perhaps the Court of Appeals would have arrived at a different result had it been construing the somewhat broader language of the arbitration clause now before us. But with all due respect to a distinguished and able court, we think the approach to the problem by the New York Court of Appeals is too narrow. This restrictive New York policy is also reflected in the opinions in several other cases. Manufacturers Chemical Co. v. Caswell, Strauss & Co., 1st Dept.1940, 259 App.Div. 321, 19 N.Y.S.2d 171, appeal dismissed 283 N.Y. 679, 28 N.E.2d 404; Cheney Bros. v. Joroco Dresses, Inc., 1st Dept. 1926, 218 App.Div. 652, 219 N.Y.S. 96, reversed on other grounds 245 N.Y. 375, 377, 157 N.E. 272; Reo Garment, Inc. v. Jason Corp., Sup.Ct.Spec.T.1958, 9 Misc.2d 521, 170 N.Y.S.2d 412; Greenspan v. Greenspan, Sup.Ct.Spec.T.1954, 129 N.Y.S.2d 258.

### III

### There Was No Waiver

One more point in this fascinating case remains to be disposed of. Lawrence asserts that Devonshire has waived its right to arbitrate or was "in default in proceeding with such arbitration" under Section 3 of the Act. The complaint was filed May 9, 1957 and in its answer filed June 13, 1957 Devonshire demanded arbitration. The motion for the stay of proceedings was made almost nine months later, March 4, 1958. During this time settlement was discussed and Devonshire consented to an examination before trial of its President. Such examination was adjourned repeatedly and has not yet been taken. Lawrence also maintains it released certain information to Devonshire otherwise unavailable and that Devonshire tested the disputed goods. The delay in moving for a stay and these various intervening acts are asserted to constitute the waiver or default. Such a contention, however, is without merit under the decided cases. Devonshire has at no time acted in a manner inconsistent with its right to arbitrate. Lawrence was apprised of

Devonshire's intention to arbitrate from the time the answer was filed and the intervening steps taken with a view toward settlement can in no way affect Devonshire's rights. Indeed, considerably more significant intervening steps have not been regarded as amounting to a waiver. See Farr & Co. v. Cia Intercontinental De Navegacion De Cuba, S.A., 2 Cir., 1957, 243 F.2d 342; Almacenes Fernandez, S.A. v. Golodetz, supra; Kulukundis Shipping Co. S/A v. Amtorg Trading Corp., supra; Reynolds Jamaica Mines, Ltd. v. La Societe Navale Caennaise, supra. In the instances where a waiver has been found the party seeking the arbitration generally first brought up the subject only after long delay or when the trial was near at hand. American Locomotive Co. v. Chemical Research Corp., 6 Cir., 1948, 171 F.2d 115, certiorari denied 1949, 336 U.S. 909, 69 S.Ct. 515, 93 L.Ed. 1074; Radiator Specialty Co. v. Cannon Mills, Inc., 4 Cir., 1938, 97 F.2d 318, 117 A.L.R. 299; La Nacional Platanera, S.C.L. v. North American F. & S.S. Corp., 5 Cir., 1936, 84 F.2d 881. The claim that Devonshire's rejection of an offer by Lawrence to arbitrate also constituted a waiver is likewise lacking in substance in view of the conditional nature of the offer.

Reversed with a direction to grant the stay.