[No. B014229. Second Dist., Div. Three. May 13, 1986.]

BENSON FORD, JR., Plaintiff and Respondent, v.
SHEARSON LEHMAN AMERICAN EXPRESS, INC.,
Defendant and Appellant.

1012

**COUNSEL**

Keesal, Young & Logan and Michael M. Gless for Defendant and Appellant.

Morrison & Foerster, James J. Brosnahan, Haley J. Fromholz and Jerry M. Custis for Plaintiff and Respondent.

**OPINION**

**LUI, Acting P. J.**—Plaintiff Benson Ford, Jr. (Ford) filed suit against his former psychotherapist, Louis Fuentes (Fuentes); his former bookkeeper and business manager, Lydia Szabo (Szabo); Shearson Lehman American Express, Inc. (Shearson), a securities broker and investment adviser; and others. Ford seeks compensatory and punitive damages from the defendants for, among other things, breach of fiduciary duty, conversion, and civil conspiracy to commit fraud.

This appeal concerns whether Ford may avoid arbitration of his disputes with Shearson when arbitration is called for by the terms of two customer brokerage agreements (agreement(s)) he apparently executed with Shearson's predecessors.

We conclude that Ford's complaint adequately pleads that the agreements (1) were unenforceable under tort principles because the fraud practiced on him by the defendants so permeated the agreements that they were vitiated; and (2) were void under contract law principles because he never voluntarily assented to the agreements because he was dominated and controlled by Fuentes, Szabo and others. Accordingly, we affirm the trial court's denial of Shearson's motion to compel arbitration and for a stay of Ford's action as to it.

## Factual and Procedural Background

The allegations in Ford's complaint against Shearson are set out in the 23d through 25th causes of action of Ford's first amended complaint. Ford alleges that Shearson, his stock broker for four years, was negligent, breached its fiduciary duties to him and defrauded him.[1]

Shearson filed an answer as well as a petition seeking to compel arbitration pursuant to the agreements.

Sometime prior to November 5, 1976, Ford had apparently executed an undated agreement with Loeb Rhoades, Hornblower & Co. (Loeb Rhoades). After Shearson merged with or acquired Loeb Rhoades, Ford apparently executed a second agreement dated November 5, 1976, with a second predecessor in interest of Shearson, namely, Hornblower Weeks Hemphill Noyes. Counsel at oral argument acknowledged that both agreements contain substantially identical language concerning arbitration.

The Loeb Rhoades agreement provides for arbitration of "all controversies which may arise concerning any transaction or the construction, performance or breach of this or any other agreement between the [parties] . . . ." Arbitration is to be "held in the City of New York pursuant to the arbitration laws of the State of New York, before the American Arbitration Association and in accordance with its rules then obtaining or before the New York Stock Exchange, Inc. or arbitration facility provided by any other exchange or by the National Association of Securities Dealers Inc. and in accordance with its rules then obtaining."

---

[1]Specifically, the 23d cause of action against Shearson and Does 51 through 70 is framed in negligence and alleges that from 1979 through 1983, Ford retained <u>Shearson</u> "to perform stock brokerage services and to provide him with investment advice." Thereafter, <u>Shearson</u> "failed to exercise reasonable competence, care, diligence and skill in performing such services . . . ." From 1979 through 1983, <u>Shearson</u> received from defendants Fuentes and Szabo some 327,000 shares of Ford Motor Company and other stock. <u>Shearson</u> "caused said stock to be liquidated and the proceeds thereof made available to . . . Fuentes and Szabo" who thereafter dissipated such proceeds "by various wrongful means, including by fraud and breach of fiduciary duty." The complaint continues and alleges that <u>Shearson</u> "knew or should have known that a fraud or breach of fiduciary duty was being committed against [Ford]." (We have underlined <u>Shearson</u> above where we have inserted its name in place of the more general word "defendants" used in the complaint since a reasonable reading of the complaint would so dictate.) The complaint also alleges that Ford suffered adverse tax consequences as the result of the liquidation of his stock.

The 24th cause of action against Shearson and Does 51 through 70 repeats certain allegations in the 23d cause of action and alleges a cause of action for breach of fiduciary duty.

The 25th cause of action against Shearson and Does 51 through 70 repeats certain allegations in the 23d and 24th causes of action and alleges a cause of action for constructive fraud.

Ford's response opposed arbitration on the sole ground that the issues involving Shearson were factually "intertwined" with the nonarbitrable claims Ford had against the other defendants and that all claims should be resolved in a single court action. Ford's opposition was premised on the federal Court of Appeals decision in *Byrd* v. *Dean Witter Reynolds, Inc.* (9th Cir. 1984) 726 F.2d 552. Subsequent to the filing of Ford's opposition, the United States Supreme Court reversed the Ninth Circuit's decision, and in so doing, rejected the "doctrine of intertwining." (See *Dean Witter Reynolds Inc.* v. *Byrd* (1985) 470 U.S. 213 [84 L.Ed.2d 158, 105 S.Ct. 1238] (*Byrd*).)

Thereafter, Ford filed a supplemental response urging that he did not initially raise additional grounds for opposing the arbitration since he had relied on the Ninth Circuit's decision in *Byrd*. In these supplemental papers, Ford urged the trial court not to compel arbitration because the agreements were obtained by Shearson "(1) as an integral part of Shearson's participation in the overall fraudulent scheme committed against Ford, (2) without Ford's knowledgeable consent, (3) while Ford was under the domination of Shearson's cotortfeasors and (4) as a principal method by which Shearson converted Ford's stock holdings to cash then turned those funds over to the control of Fuentes and other defendants." Ford argued that the agreements were "fraudulently obtained, not knowledgeably given and were part of an overall plan to defraud Ford," and that Shearson's fraud so "permeated the entire agreements" that the issue must be adjudicated judicially rather than by arbitration.

Following a hearing on Shearson's motion, the court entered an order denying Shearson's motion to compel arbitration. Shearson filed a timely notice of appeal.[2]

### DISCUSSION

1. *Federal and State Law Relating to the Enforceability of Arbitration Clauses*

The parties to this appeal are correct in urging that federal law, namely, the Federal Arbitration Act (9 U.S.C.A. § 2), is applicable since the agreements in question involve securities transactions in interstate commerce. (*Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19 [136 Cal.Rptr. 378] (*Main*).)

---

[2]The order denying a motion seeking to compel arbitration is appealable. (See Code Civ. Proc., § 1294, subd. (a); and *Pacific Inv. Co.* v. *Townsend* (1976) 58 Cal.App.3d 1 [129 Cal.Rptr. 489].)

We first examine our Supreme Court's decision in *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc.* v. *100 Oak Street* (1983) 35 Cal.3d 312 [197 Cal.Rptr. 581, 673 P.2d 251] (*Ericksen*), since this decision is one on which both parties rely heavily in making their respective arguments in this appeal.

In *Ericksen*, our Supreme Court considered an arbitration clause contained in a lease. The arbitration did not involve the Federal Arbitration Act since the lease was not a maritime contract or a contract which concerned interstate commerce. The trial court had denied the lessor's petition to compel arbitration of the plaintiff law firm's action which alleged that the leased premises had become untenantable because of defective air conditioning. Our Supreme Court reversed and directed the trial court to vacate its order denying the lessor's petition and to enter a new order granting the petition.

The court in *Ericksen* was confronted with the question as to whether a court or an arbitration panel should "decide a party's claim that the underlying agreement (as distinguished from the agreement to arbitrate) was procured by fraud." (*Id.,* at p. 316.) The court reviewed various federal and state decisions and concluded that the prevailing majority rule favoring arbitration as reflected in *Prima Paint* v. *Flood & Conklin* (1967) 388 U.S. 395 [18 L.Ed.2d 1270, 87 S.Ct. 1801] (*Prima Paint*); *Robert Lawrence Company* v. *Devonshire Fabrics, Inc.* (2d Cir. 1959) 271 F.2d 402, cert. dism. (1960) 364 U.S. 801 [5 L.Ed.2d 37, 81 S.Ct. 27] (*Devonshire*); and *Weinrott* v. *Carp* (1973) 32 N.Y.2d 190 [344 N.Y.S.2d 848, 298 N.E.2d 42] (*Weinrott*), should apply and that the majority rule was compatible with the California arbitration statute (Code Civ. Proc., § 1281 et seq.).

The decision in *Ericksen* states that "[t]he scope of arbitration is, of course, a matter of agreement between the parties, and if they choose to limit that scope so as to exclude questions of fraud in the inducement of the contract that choice must be respected. In this state, as under federal law [citation], doubts concerning the scope of arbitrable issues are to be resolved in favor of arbitration. [Citations.] Therefore, in the absence of indication of contrary intent, and where the arbitration clause is reasonably susceptible of such an interpretation, claims of fraud in the inducement of the contract (as distinguished from claims of fraud directed to the arbitration clause itself) will be deemed subject to arbitration.[8]" (*Ericksen, supra,* 35 Cal.3d at p. 323.)

 Footnote 8 in *Ericksen* states: "As was observed in *Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19, 27 [136 Cal.Rptr. 378], courts which follow the majority rule have held that fraud which 'permeated the entire contract including the arbitration provision'

vitiates the arbitration agreement and requires judicial determination. (E.g., *Moseley* v. *Electronic Facilities* (1963) 374 U.S. 167, 170-171 [10 L.Ed.2d 818, 820-821, 83 S.Ct. 1815]; *Weinrott* v. *Carp, supra,* 298 N.E.2d 42.) *The permeation doctrine is inapplicable here because, '[c]ertainly this is not a case . . . where the defendant [lessee] denied ever agreeing to anything.' (Robert Lawrence Company* v. *Devonshire Fabrics, Inc., supra,* 271 F.2d at p. 411.) Ericksen, a law firm, was concededly aware of the arbitration provision." (*Ericksen, supra,* at p. 323, italics added.)

Ford relies on the permeation doctrine referred to in footnote 8 of *Ericksen* and asserts that the fraud perpetrated on him so permeated the agreements that the agreements were vitiated. He contends that the permeation doctrine was not asserted by the plaintiff in *Ericksen* and therefore *Ericksen* is inapplicable to this appeal. He argues that the permeation doctrine is recognized in California law by *Main* and by federal law in *Moseley* v. *Electronic Facilities* (1963) 374 U.S. 167, 170-171 [10 L.Ed.2d 818, 820-821, 83 S.Ct. 1815] (*Moseley*), and that the doctrine remains viable law.

Ford also argues that the decisions in *Prima Paint, Devonshire,* and *Weinrott* are distinguishable because the fraud asserted by the plaintiffs in those cases dealt with fraud concerning the "performance" of a contract and not fraud in the "making" or procurement of a contract. He contends that he did not voluntarily assent to the agreements and that the fraud he alleges in his complaint goes to the "making" of the contract, which, if proven, would void the agreements and the arbitration clause contained therein. We agree with Ford's contention.

In *Main,* a customer brought an action against the stockbrokerage firm of Merrill Lynch, Pierce, Fenner & Smith, Inc., for losses and damages due to discretionary sales and purchases of securities under a lending agreement. Plaintiff was aged and unschooled in business affairs and did not know the true nature or content of the documents placed before her. Although defendants knew of her ignorance, they induced her to sign the documents by misrepresenting the nature and content of the documents and by not advising her that by signing the documents she was required to submit all controversies to arbitration. Because of the confidential relationship which had existed, she was accustomed to signing documents at defendants' request; if she had known the true nature and content of the documents, she would not have signed them. The trial court denied defendants' petition to compel arbitration pursuant to the arbitration clause contained in the lending agreement. The appellate court affirmed and ordered the trial court to set the case for trial to determine the issues recognized in the order denying the petition to compel arbitration.

The court in *Main, supra,* 67 Cal.App.3d at pages 31-33, stated: "A confidential relationship 'may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another.' [Citations.] And where the person in whom such confidence is reposed, by such confidence obtains any control over the affairs of the other, a trust or fiduciary relationship is created. [Citations.]

"'"When a fiduciary enters into a transaction with a beneficiary whereby the fiduciary's position is improved, or he obtains a favorable opportunity, or where he otherwise gains, benefits, or profits, it may fairly be said that an advantage has been obtained."'' [Citations.]

". . . . . . . . . . . . . . . . . . . . . . . . .

"It is the settled law of this state, and elsewhere, that '"[W]here there exists a relationship of trust and confidence it is the duty of one in whom the confidence is reposed to make full disclosure of all material facts within his knowledge relating to the transaction in question and any concealment of material facts is a fraud."' [Citations.] '"Where there is [such] a duty to disclose, the disclosure must be full and complete, and any material concealment or misrepresentation will amount to fraud sufficient to entitle the party injured thereby to an action."' [Citations.]

". . . . . . . . . . . . . . . . . . . . . . . . .

"'[T]his section [Civ. Code, § 1573] states the rule applicable in confidential relations. . . . "Constructive fraud . . . is presumed from the relation of the parties to a transaction, or the circumstances under which it takes place. . . . Constructive fraud often exists where the parties to a contract have a special confidential or fiduciary relation, which affords the power and means to one to take undue advantage of, or exercise undue influence over, the other."' [Citations.] And under such circumstances 'undue influence' will also be inferred, or presumed. [Citations.] [Fn. omitted.]"

The court in *Main* concluded: "The record thus demonstrates that the allegations of plaintiff's complaint sufficiently alleged fraud and undue influence, not only in the inducement of the *entire* lending agreement, but also in the inducement of its arbitration clause." (*Id.,* at p. 33, italics added.)

In *Moseley, supra,* 374 U.S. 167, the United States Supreme Court reviewed an arbitration provision contained in two subcontracts between petitioner Moseley Plumbing and Heating Company and respondent Elec-

tronic & Missile Facilities, Inc., for work to be performed in the State of Georgia. The subcontracts provided for arbitration in New York. After disputes arose between the parties, the respondent filed suit in the New York state court seeking an order directing arbitration in accordance with the arbitration provisions.

Moseley then filed suit in the federal district court in Georgia where the work was being performed. He claimed "that the subcontracts with him, as well as other subcontractors, were a fraudulent scheme to obtain a great amount of work and material from [him] and the other subcontractors without making payment therefor and to 'browbeat' [him] and his fellow subcontractors into accepting much less than the value of their claims. One of the means used to effect such scheme was alleged to be the insertion in the subcontracts of an arbitration clause requiring arbitration of disputes in New York." (*Id.*, at p. 171 [10 L.Ed.2d at p. 821].) The district court ruled that if the arbitration clause was induced by fraud, such fraud would vitiate the entire agreement and therefore issued a permanent restraining order enjoining the arbitration proceedings in New York. The Court of Appeals reversed, holding that Moseley must arbitrate in New York under New York law.

The United States Supreme Court granted certiorari and held that the issue of fraud should be first adjudicated before the rights of the parties under the subcontract could be determined. The court stated: "In considering the question of the sufficiency of the pleadings with reference to the allegation of fraud, we believe that, as alleged here, the issue goes to the arbitration clause itself, since it is contended that it was to be used to effect the fraudulent scheme. If this issue is determined favorably to the petitioner, there can be no arbitration under the subcontracts." (*Ibid.*)

In a separate opinion in *Moseley*, Chief Justice Warren, joined by Justice Black, stated: "We agree with the Court that fraud in the procurement of an arbitration contract, like fraud in the procurement of any contract, makes it void and unenforceable and that this question of fraud is a judicial one, which must be determined by a court. To allow this question to be decided by arbitrators would be to that extent to enforce the arbitration agreement even though steeped in the grossest kind of fraud. Compare *Robert Lawrence Co.* v. *Devonshire Fabrics, Inc.* 271 F.2d 402 (CA2d Cir 1959). For this reason we acquiesce in the Court's present disposition of the case on this single issue. But we point out that this disposition leaves open questions of great importance to laborers and materialmen who under the Miller Act are entitled to have their controversies settled in independent courts of law . . . ." (*Id.*, at p. 172 [10 L.Ed.2d at p. 822].)

In our view, Ford justifiably relies on *Main* and *Moseley,* and Shearson incorrectly relies on and misconstrues the decisions in *Ericksen, Prima Paint, Devonshire* and *Weinrott.* These decisions do not present the type of fraud in the inducement of a contract which goes to the making or procurement of a contract. Rather, these decisions deal with the type of fraud which goes to the performance under a contract and the fraud alleged was a "disappointed expectation" concerning such performance. For example, in *Ericksen,* the plaintiff law firm, obviously aware of the arbitration clause contained in the lease, claimed they were defrauded by the landlord's misrepresentations as to the quality of the air conditioning to be provided pursuant to a lease.

In *Prima Paint, supra,* 388 U.S. 395, the misrepresentation pertained to the defendant's solvency and ability to perform his contractual obligations under the agreement. Prima Paint agreed to purchase defendant's paint business and defendant agreed to furnish advice and consultation for a six-year period.

The type of fraud advanced in *Prima Paint* dealt with the defendant's performance. The court stated: "Accordingly, if the claim is fraud in the inducement of the arbitration clause itself—*an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it.* [Fn. omitted.] But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally. . . ." (*Id.,* at pp. 403-404 [18 L.Ed.2d at p. 1277], italics added.) "In the present case no claim has been advanced by Prima Paint that [defendant] F & C fraudulently induced it to enter into the agreement to arbitrate '[a]ny controversy or claim arising out of or relating to this agreement, or the breach thereof.' This contractual language is easily broad enough to encompass Prima Paint's claim that both execution and acceleration of the consulting agreement itself were procured by fraud. *Indeed, no claim is made that Prima Paint* ever intended that 'legal' issues relating to the contract be excluded from arbitration, or that it *was not entirely free so to contract.*" (*Id.,* at p. 406 [18 L.Ed.2d at pp. 1278-1279], italics added.)

In *Devonshire, supra,* 271 F.2d 402, plaintiff sought damages for the alleged fraudulent misrepresentations made by Devonshire inducing it to purchase and pay for a quantity of woolen fabric. According to Lawrence, certain latent defects were discovered and the merchandise proved not to be of "first quality" as called for by the agreement. The district court held that the "only fraud charged is fraud in inducing the purchase of the goods, rather than fraud in connection with the making of the agreement to arbitrate." (*Id.,* at p. 409.) In reversing the district court's denial of a stay order pending arbitration, the Court of Appeals stated in reference to the

Federal Arbitration Act, Section 2, "The saving clause of Section 2 fits perfectly into the framework disclosed by the above analysis. The agreement described in Section 2 is the arbitration 'provision' or clause of the principal contract. If this arbitration clause was induced by fraud, there can be no arbitration; and if the party charging this fraud shows there is substance to his charge, there must be a judicial trial of that question before a stay can issue in a case of the type with which we are now dealing. *It is not enough that there is substance to the charge that the contract to deliver merchandise of a certain quantity was induced by fraud.*" (*Id.*, at pp. 410-411.)

In *Weinrott, supra,* 298 N.E.2d 42, the alleged fraud dealt with the misrepresentations regarding the capabilities of a process developed for the construction of single and double-story buildings utilizing panels made of plywood and polyurethane filler which would make conventional framing unnecessary. Again, there was no claim of fraud with respect to the making of the agreement containing the arbitration clause. Rather, the fraud alleged dealt with the defendant's misrepresentations regarding the performance to be rendered pursuant to a licensing and joint-venture agreement which plaintiffs were induced to sign because of the misrepresentations.

Our review of *Ericksen, Prima Paint, Devonshire* and *Weinrott* reveals that those decisions are distinguishable and inapplicable to the instant appeal since Ford alleges that the fraud practiced on him pertained to the "making" of the agreements containing the arbitration clause. Because Ford sufficiently alleged in his complaint that he was induced by fraud to make the agreements and that his assent to the agreements was not voluntary, the determination of whether such fraud or undue influence ever occurred must be initially determined by a court and not by arbitration.

Shearson also relies on the United States Supreme Court's decision in *Byrd, supra,* 470 U.S. 213 [84 L.Ed.2d 158, 105 S.Ct. 1238], arguing that *Byrd* holds that a claim of fraud in the inducement is a matter subject to arbitration proceedings. We disagree and find the decision in *Byrd* to be inapplicable to the instant appeal. *Byrd* was directed principally to the "doctrine of intertwining" and did not deal with the permeation doctrine espoused in *Main* and *Moseley.*

Shearson also relies on the recent decision in *Southland Corp.* v. *Keating* (1984) 465 U.S. 1 [79 L.Ed.2d 1, 104 S.Ct. 852] (*Southland*). In *Southland,* consolidated actions were brought in the superior court against Southland, a franchisor of convenience stores. The plaintiff franchisees alleged, inter alia, fraud, misrepresentation, breach of contract, breach of fiduciary duty, and violation of the disclosure requirements of a state statute relating to franchise investments. Southland moved to compel arbitration of the claims

pursuant to the arbitration provision of the franchise agreements; the franchisees moved for class certification. The superior court denied the franchisor's motion seeking to compel arbitration of claims involving the state statute. The California Court of Appeal reversed the superior court's order denying arbitration on those claims. The California Supreme Court reversed the California Court of Appeal's decision and interpreted the state statute to require judicial consideration of claims brought under the statute and holding that the statute did not conflict with the Federal Arbitration Act.

The United States Supreme Court in *Southland* reversed the judgment of the California Supreme Court and remanded the case. ■ The court stated: "In enacting § 2 of the federal Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration. . . .

"*We discern only two limitations on the enforceability of arbitration provisions governed by the Federal Arbitration Act: they must be part of a* written maritime contract or *a contract 'evidencing a transaction involving commerce'* [*fn. omitted*] *and such clauses may be revoked upon 'grounds as exist at law or in equity for the revocation of any contract.'* We see nothing in the Act indicating that the broad principle of enforceability is subject to any additional limitations under state law." (*Southland Corp.* v. *Keating, supra,* 465 U.S. at pp. 10-11 [79 L.Ed.2d at p. 12], italics added.)

■ While the United States Supreme Court in *Southland* recognized the national policy favoring arbitration, the decision actually favors Ford's position on appeal and not Shearson. The court in *Southland* specifically exempted the enforceability of arbitration provisions governed by the Federal Arbitration Act if grounds for revocation "exist at law or in equity for the revocation of any contract." Under *Southland,* the question is whether Ford's complaint alleges a basis for revocation of the agreements at law or in equity under California tort and contract law. As discussed below, we conclude that Ford has successfully pled such grounds for revocation. Therefore, the threshold issues of whether the agreements were procured by fraud or not voluntarily assented to must be initially determined by a court and not by arbitration.

2. *The Allegations of Ford's First Amended Complaint Sufficiently Allege That Fraud Permeated the Agreements and That His Assent to the Agreements Was Involuntary*

A. *Ford's Complaint and Declaration*

■ ■ The first amended complaint is somewhat general in its allegations as to Shearson. Ford's counsel offers the reasonable explanation

that the allegations against Shearson were general by necessity and did not mention the agreements because Ford was unaware of the existence of the agreements at the time of the filing of his complaint. Ford has now been advised of a large number of other documents and checks which apparently bear his signature and pertain to the period in which his business was controlled by the defendants.

With reference to Shearson, the allegations of the complaint may reasonably be summarized as follows:

While attending Whittier College in the early 1970's, Ford, an heir to the Ford Motor Company fortune, was treated and counseled by Fuentes, who held himself out to be a psychotherapist. Soon after meeting Ford, Fuentes gave up his full-time practice of psychotherapy to become Ford's "business adviser." Using his psychotherapist-patient relationship with Ford, Fuentes was able to secure Ford's complete trust and confidence from 1971 through 1983. Fuentes dominated Ford and was successful in gaining Ford's confidence to supervise and control his wealth and business affairs.

Fuentes induced Ford into various business partnerships in which Ford provided the capital and Fuentes received significant profits. Over a period of years, Fuentes and his agents managed to gain control of nearly all of Ford's approximately $25 million in assets and misappropriated, dissipated or converted the bulk of these assets.

Fuentes was the main perpetrator of the scheme to defraud Ford. He acted in concert with Szabo and others and enlisted the aid of several of his other former psychotherapy patients, including Glen Hughes, a Shearson account executive and thus Shearson's agent. Between 1979 and 1983, Ford retained and employed Shearson to conduct brokerage services and to advise him on his investments. During this period, Shearson received from Fuentes and Szabo some 327,000 shares of Ford's stock in Ford Motor Company and other companies. Shearson liquidated these shares and the proceeds were wrongfully diverted by Fuentes and Szabo.

As part of Ford's opposition to the motion to compel arbitration, Ford submitted his declaration which contains factual matters not refuted by Shearson. Ford's declaration states: "I have been informed that Shearson . . . contends that I signed documents agreeing to arbitration of my claims against Shearson. If I did sign those papers, I did so only because I was told to do so by Mr. Hughes or Mr. Fuentes or by Lydia Szabo, who also was a psychotherapy patient of Mr. Fuentes and was brought in by Mr. Fuentes to help him control my property and my access to it. At the time that Shearson says I signed those documents, Fuentes, Szabo and the other

defendants working with them were controlling my life and everything having to do with my business affairs. When they directed me to sign papers, I did so because, for all of the reasons I have stated in paragraphs 18 to 25, and 31 of my First Amended Complaint, I felt I had to comply with their directions. I had no opportunity to make any independent judgment about whether to sign or not sign papers such as the Shearson arbitration papers, and if I did sign them I did not know what they said or what their effect was but signed them because I was told to do so.

" . . . . . . . . . . . . . . . . . .

"Except for one or two occasions, I never saw any of the proceeds that Shearson obtained from disposing of my property. Mr. Hughes, Mr. Fuentes, Ms. Szabo and possibly others had a system worked out so that all of the money obtained from sale of my stock and other investments was handed over directly to Fuentes and Szabo. I believe that is the main way that Fuentes, Szabo and the other defendants were able to take my property from me."

Shearson invoked the procedure for enforcement of arbitration agreements provided for in Code of Civil Procedure sections 1281.2 and 1290 et seq.[3] Ford's response to Shearson's petition includes his declaration which restates matters contained in his first amended complaint and adds additional matters consistent with the facts stated in his verified complaint.

Section 1281.2 provides in pertinent part: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, *the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that:* . . . [¶] *(b) Grounds exist for the revocation of the agreement.*" (Italics added.) Section 1281 provides that "[a] written agreement to submit to arbitration an existing controversy . . . is valid, enforceable and irrevocable, *save upon such grounds as exist for the revocation of any contract.*" (Italics added.) (See discussion, *ante,* at pp. 1023-1024, as to *Southland, supra,* 465 U.S. 1 [79 L.Ed.2d 1].)

The issue tendered by the parties below was a question of law, *viz.,* whether the allegations of the complaint raised the issues that (1) fraud so permeated defendants' relationship with Ford and the business transactions they conducted as to his assets, that the fraud vitiated the agreements under

---

[3]Unless otherwise indicated, all statutory references hereinafter made are to the Code of Civil Procedure.

tort principles; and (2) Ford never voluntarily assented to the agreements due to the dominance and control of Fuentes and others thereby rendering the agreements void under contract principles.

The question tendered was a matter of law since the sufficiency of the allegations in Ford's complaint was at issue and because the matters contained in his declaration were not refuted by Shearson. (See *Main, supra,* 67 Cal.App.3d at p. 28.)

■ A declaration submitted by a party in support of or in opposition to a motion seeking to compel arbitration filed pursuant to section 1290[4] may be necessary in circumstances such as are present here because of Ford's contention that he was unaware of the existence of the agreements when he filed his complaint. In these situations, the trial court may find it necessary to decide the petition using matters outside the four corners of the complaint in determining whether "grounds exist for the revocation of the agreement" which requires arbitration of disputes. Under the circumstances, Ford's declaration was properly considered by the trial court in making its ruling on Shearson's petition since his declaration did not conflict and was consistent with the matters contained in his verified complaint.

B. *The Complaint Sufficiently Alleges That Fraud Permeated the Agreements*

■ While the allegations in Ford's complaint are less specific than those contained in the complaint in *Main,* the complaint clearly alleges a scheme of domination, control, concealment, misrepresentation and advantage gained by virtue of the fiduciary position Fuentes, Szabo, Shearson and others had secured with Ford in which all defendants participated and profited.

The record demonstrates that the allegations in Ford's first amended complaint sufficiently allege a grand scheme of fraud which permeated the entire relationship and transactions perpetrated by all defendants, including Shearson and that Shearson and other defendants occupied a fiduciary relationship with Ford which they breached. The fact that the first amended complaint does not specifically allege that Shearson individually committed specific acts of fraud against Ford is of no moment. What is important is

---

[4]Section 1290 provides: "A proceeding under this title [arbitration] in the courts of this State is commenced by filing a petition. Any person named as a respondent in a petition may file a response thereto. The allegations of a petition are deemed to be admitted by a respondent duly served therewith unless a response is duly served and filed. The allegations of a response are deemed controverted or avoided."

that the complaint charges that Shearson participated with others in a scheme to defraud Ford.

C. *The Complaint Sufficiently Alleges That Ford's Assent to the Agreements Was Not Voluntary*

The first amended complaint also sufficiently alleges that Ford's assent to the agreements was not voluntary. Paragraph 27 of the first amended complaint states: "In their management and supervision of plaintiff's financial affairs, defendants exercised complete control, including the receipt of all income and the making of all payments. On the instructions of defendants, plaintiff turned over to them all his credit cards and pre-signed and left with defendants a large number of checks." Ford's declaration states that if he signed the agreements containing the arbitration clause, he did so only because he was told to do so by Hughes, Fuentes or Szabo during a time in which these persons controlled his life and business affairs.

Section 1550 of the Civil Code provides: "It is essential to the existence of a contract that there should be: [¶] 1. Parties capable of contracting; [¶] 2. Their consent; [¶] 3. A lawful object; and [¶] 4. A sufficient cause or consideration." With respect to the essentials of consent, section 1565 of the Civil Code provides "[t]he consent of the parties to a contract must be . . . [f]ree . . . ."

"In the usual case of fraud, where the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable*. In order to escape from its obligations the aggrieved party must *rescind*, by prompt notice and offer to restore the consideration received, if any. [Citations.]" (1 Witkin, Summary of Cal. Law (8th ed. 1973) § 321, p. 270; italics in original.)

"[T]he cases recognize the familiar distinction between fraud in the inducement . . . and fraud in the *inception, factum, or execution*. If the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all, mutual assent is lacking, and it is *void*. In such a case it may be disregarded without the necessity of rescission. (See . . . *Bonacci* v. *Mass. Bonding & Ins. Co.* (1943) 58 C.A.2d 657, 664, 137 P.2d 487 . . . .)" (1 Witkin, Summary of Cal. Law, *supra*, § 322, pp. 270-271, italics in original.)

Since Ford declares that his signature on the agreements was obtained involuntarily upon the orders of Fuentes, Szabo or Hughes, the type

of fraud he alleges is fraud in the inception. If this type of fraud is proven, the agreements would be void *ab initio* and the arbitration clause contained therein would fall.

In conclusion, the record demonstrates that Ford's first amended complaint sufficiently alleges two separate theories that are grounds for revoking the agreements under California law. We thus conclude that the superior court correctly denied Shearson's petition to compel arbitration. The trial court should now set the case for a hearing to determine the threshold issues of whether fraud or undue influence was practiced by Shearson. If the trial court determines either of these issues in Ford's favor, litigation should proceed as to Shearson. If the trial court resolves both of these issues in favor of Shearson, the trial court should enter an order compelling all claims against Shearson to be resolved by arbitration pursuant to the terms of the agreements.

### 3. *Shearson's Other Contentions*

We have reviewed Shearson's contention regarding the conflict in Ford's declaration and deposition testimony. Since the papers asserting this conflict were filed by Shearson in an untimely manner so as to prevent Ford from having an opportunity to respond and to rebut them, we reject this contention.

Finally, since we have concluded the brokerage agreements between Shearson and Ford were sufficiently alleged to have been vitiated by fraud and/or undue influence, we need not address Shearson's contention that Ford cannot avoid the agreements due to his failure to read them.

### DISPOSITION

The order denying Shearson's motion to compel arbitration is affirmed.

Danielson, J., and Arabian, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 24, 1986.